# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

JOHN M. CARMAN,

    Plaintiff,

vs.                              Case No.  1:07cv210-MP/WCS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

    This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

    Plaintiff, John M. Carman, applied for disability insurance benefits and supplemental security income (SSI) benefits.  The first administrative hearing, on October 1, 2003, resulted in denial of the application.  The application was denied on appeal and suit was filed in this court.  Case No. 1:04cv103-MP/AK.  On a consented

motion of Defendant, the judgment was reversed on January 23, 2006, and the application was remanded. R. 501-503.

A second administrative hearing was held on April 4, 2007, R. 464-500, and this resulted in a decision on June 13, 2007, by the Administrative Law Judge denying benefits. R. 451-463. This civil action was commenced seeking review of that decision.

Plaintiff was nearly 50 years old at the time of the last administrative hearing, has a limited 7th grade education, and has past relevant work as a motor vehicle mechanic. Plaintiff's insured status for disability insurance benefits expired on December 31, 1999. Doc. 16, p. 2 n. 1. Plaintiff was 42 years old on that date. R. 461. Plaintiff alleges disability with onset on June 13, 1999, due to left eye blindness, right hand injury, and a herniated disc.

The Administrative Law Judge found that Plaintiff has the following severe impairments: chronic pain syndrome, limited function in the right upper extremity secondary to right radial forearm nerve entrapment, status-post right wrist arthroscopy, right carpal tunnel syndrome, and status-post right ulnar shortening osteotomy, reduced grip strength on the right, mild compression neuropathy of the left radial nerve in the supine position, status-post open reduction and internal fixation of a left femoral intratrochanteric fracture with hardware due to a proximal femur fracture, blindness in the left eye,[1] and a history of childhood amblyopia[2] – status-post strabismus surgery as

---

[1] The ALJ noted that Plaintiff had testified that he is blind in one eye, but he said that "the record shows that it does not prevent him from driving or performing activities of daily living." R. 459.

[2] Amblyopia is impairment of vision not due to organic defect or refractive errors. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Case No. 1:07cv210-MP/WCS

a child.  R. 457.  He found that Plaintiff has the residual functional capacity to perform a wide range of unskilled sedentary work without manipulative limitations or significant memory deficits.  R. 458.  He found that Plaintiff could do work as a cashier, dispatcher for a street department, or mail room clerk or tube operator, R. 459-460, and therefore was not disabled as defined by Social Security law prior to December 31, 1999, for disability insurance benefits, through June 13, 2007, the date of the decision, for SSI benefits.  R. 452.

Plaintiff contends that the ALJ's rejection of Plaintiff's testimony as to the degree of pain he suffers did not follow the law and was not based upon substantial evidence in the record.  Doc. 11, p. 8.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

     A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

     The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

> 3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?
>
> 4. Does the individual have any impairments which prevent past relevant work?
>
> 5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

Plaintiff testified at the second administrative hearing that when he tried to fill out the forms for his application for benefits, he needed help because his right hand "at that time was totally useless to me." R. 468. He is right-handed. *Id.*

Plaintiff said that he returned to light work in May, 1999, doing maintenance work. R. 468. He quit that work in June, 1999, due to a job injury to his right arm and wrist. R. 469. After that, said Plaintiff, his right hand, wrist, and elbow were painful and he did not have a good grip. R. 470.

Plaintiff said that the pain in his right arm has been "constant" at a level of 8 on a scale of 10 since the injury in 1999.  R. 470.  He said that he now experiences pain from his shoulder down, but the pain was only in his wrist and elbow when he stopped working.  *Id.*

Plaintiff said he had taken Lortab,[3] Darvocet,[4] Ultram,[5] and other pain medications, and he said that the medications had become progressively stronger.  R. 471-472.  He said he experienced side-effects, personality changes, loss of sleep, loss of concentration, and reduced vision.  R. 472.  He also had dizziness and headaches.  R. 473.

Plaintiff said that he could not do anything with his right hand.  R. 473.  He said he could not put any pressure on it.  *Id.*  He thought that two or three pounds was the most he could lift with his right hand due to pain and weakness, described as "just the hand turning lose on me."  *Id.*  He also said he could carry a cup of coffee with that hand, implying that this the most he could do with the right hand.  R. 476.  Plaintiff said that he had worn a prescribed brace since the injury in 1999.  R. 474-475.  He said that he spent more than 80% of the day resting his right arm in an immobilized position.  R. 476.  Plaintiff said that he could carry 20 to 30 pounds with his left hand and arm.  *Id.*

---

[3] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE (2004), p. 3233.

[4] Darvocet-N 50 or 100 contains propoxyphene hydrochloride, a mild narcotic analgesic related to methadone.  PHYSICIANS' DESK REFERENCE (2004), pp. 403-404.

[5] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic.  PHYSICIANS' DESK REFERENCE (2005).

Plaintiff said he could sit only for about 25 minutes before having to move. R. 476-477. After 25 minutes, Plaintiff said his "back and legs starts killing me." R. 477. He said he could walk only five or ten minutes before experiencing a sharp pain in his hip. *Id*. He thought he could stand for only 30 to 40 minutes. R. 478. Plaintiff said that he had screws in his hip to repair a fracture from a fall. R. 483. Plaintiff thought that his hip surgery had been done in 2003. R. 488.

Plaintiff said he had a Ford Ranger truck with an automatic transmission. R. 480. He said he was blind in his left eye. R. 481. He said he could see shadows with that eye. *Id*.

The vocational expert testified that if Plaintiff could change his positions as needed, was required to sit, stand, walk, and drive only four hours at a time, was required to lift and carry up to 10 pounds frequently, and 20 pounds occasionally, could use his hands for repetitive grasping and fine manipulation, both right and left, could occasionally use foot controls, could bend, squat, stoop, crawl, climb, reach, push, and pull, he could perform work in the national economy as a cashier II, work to dispatch trucks, or work in a mail room operating pneumatic tubes. R. 490-492. The expert also said that Plaintiff could still do these jobs even if limited to carrying five pounds with his injured hand, and 10 pounds with both hands. R. 494-495.

The expert was then asked to assume that Plaintiff can lift and carry 20 to 30 pounds with his left hand, but less than five pounds with his right hand, can sit for only 25 minutes and then must stand and move, can walk from five to 10 minutes at a time, can stand 30 to 40 minutes at a time, can squat, bend, kneel but not on his left leg, and has blindness in the left eye but with visual acuity of 20/30 using both eyes. R. 495.

The expert said that Plaintiff would still be able to do work as a cashier II, dispatcher, and tube operator.  R. 496.

However, said the expert, if Plaintiff was found to suffer from a marked amount of pain, that is, as he testified, eight on a scale of 10, and needed to take two extra 15 minute breaks each day in addition to the usual two 15 minute breaks, the expert said that there would be no jobs in the national economy that the Plaintiff could do.  R. 497.

**Medical Evidence**

On June 1, 1993, Dr. DePaz determined that Plaintiff could still perform light work.[6]  R. 190-191.  On August 25, 1993, Dr. DePaz determined that Plaintiff had a 27% permanent impairment rating based upon his herniated nucleus pulposus in the cervical spine as seen on MRI, status post closed hand injury, and mild deficit of high cognitive functioning as determined by a neuropsychological evaluation.  R. 189.  This finding did not account for any permanent impairment due to the orbital fracture, but Dr. Smith assigned no impairment for that injury.  R. 189, 204.

---

[6] The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

On May 31, 1999, Plaintiff went to Shands at Alachua General Hospital emergency room for a right palm and wrist injury, with numbness and tingling. R. 217. The x-ray revealed no evidence of fracture or dislocation. R. 223.

Plaintiff saw Dr. Vidya Jain on June 9, 1999. R. 260. Dr. Jain noted that the injury occurred on May 28, 1999. *Id.* On examination Plaintiff's right wrist was found to be "globally tender." *Id.* Plaintiff reported "constant burning" of the right hand, right thumb, and middle and index finger. R. 261. The diagnosis was possible scaphoid lunate tear of the right wrist, right carpal tunnel syndrome, and right DeQuervain's disease. *Id.* Dr. Jain advised Plaintiff to have an MRI, a NCS,[7] and an EMG.[8] *Id.* Dr. Jain released Plaintiff to "light duty, no lifting over 10 lbs with a splint." *Id.*

The NCS and EMG report on July 26, 1999, indicated mild right radial nerve entrapment in the forearm. R. 253. It was noted by the physician, George G. Feussner, M.D., that Plaintiff might also have an injury to the radial nerve distally near the "anatomical snuffbox."[9] *Id.* Plaintiff's medications were noted as Vicoprofen and Ultram. *Id.*

---

[7] Nerve conduction study or nerve conduction velocity study. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at: http://www.mercksource.com (Medical Dictionary link).

[8] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[9] The "anatomical snuffbox" is a "hollow seen on the radial aspect (the thumbside) of the dorsum (the back) of the wrist when the thumb is extended fully. The reason that it is called the anatomical snuffbox is that snuff (powdered tobacco) could be put there and then inhaled." See Medicine Net.com, available at: www.medterms.com/script/main/art.asp?articlekey=13291

On August 12, 1999, Plaintiff was seen by Dr. Jain. R. 252. Tinel's[10] and Phalen's[11] signs were positive. *Id.* Dr. Jain thought that Plaintiff could continue to do light work with no lifting over 10 pounds. *Id.*

On September 21, 1999, Dr. Jain performed arthroscopy of the right wrist, with release of several nerves, including the carpal tunnel. R. 243. On February 2, 2000, Plaintiff continued to report pain at a level of ten in his right thumb and two fingers, and he did not have any significant increase in grip strength on the right side. R. 230. Still, Dr. Jain released Plaintiff to light work. R. 231.

Plaintiff underwent right ulnar shortening osteotomy on May 9, 2000. R. 347. Plaintiff suffered the complication of a fracture through the distal late screwhole. R. 269. On July 17, 2000, Plaintiff reported decreasing pain. *Id.* Dr. Dell, the surgeon, noted that the pain was "nearly gone at the fracture site." *Id.* He referred Plaintiff to occupational therapy. *Id.* On August 7, 2000, however, Plaintiff reported that pain was still present. R. 268. At that time, Plaintiff had no use of that arm. *Id.* It was noted that Plaintiff was improving on September 11, 2000, though Plaintiff continued to have pain. R. 267. Dr. Sforzo determined that Plaintiff could do light duty only at work, with no use of his right upper extremity. *Id.* Plaintiff returned on October 9, 2000, still with wrist

---

[10] Tinel's sign is: "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[11] "Phalen's maneuver is described as follows: the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure for 30 to 60 seconds." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

Case No. 1:07cv210-MP/WCS

pain, unknown cause.  R. 266.  Again, he was thought to be fit for light work, but with no use of the right hand.  *Id.*  Plaintiff returned on October 23, 2000, complaining of "a lot of pain in his wrist."  R. 265.  An injection was given.  *Id.*  His work status was much the same, "no use of the right hand, five pound weight lift limit."  *Id.*  That same work restriction was noted on December 11, 2000, no lifting greater than five pounds, no use of his right arm, and wear a splint at work.  R. 264.

On April 18, 2001, Plaintiff was treated by Robert Greenberg, M.D.   R. 306.  Plaintiff complained of shortness of breath, and continued to smoke two packs of cigarettes as he had done for 29 years.  *Id.*  Plaintiff reported continued pain in his right wrist and arm, and an inability to do any lifting with it.  *Id.*  He reported that he was blind in his left eye.  *Id.*  Plaintiff also reported that he had constant neck pain radiating to both arms from an injury in 1992, and constant low back pain radiating to his right leg.  *Id.*  Upon examination, Dr. Greenberg found that Plaintiff could only see hand movement with his left eye, but was 20/30 in his right eye and both eyes together.  *Id.*  His left eye drifted laterally.  *Id.*  Dr. Greenberg noted decreased range of motion of the cervical and lumbar spine, but full range of motion of other joints.  R. 307.  Plaintiff's right bicep had atrophied one inch, and there was also atrophy of his right forearm, and the right arm was tender to palpation.  *Id.*  Straight leg raising was positive for pain at only 15 degrees.  *Id.*  Fine manipulation of the hands was normal.  *Id.*  Dr. Greenberg's impression was blindness of the right eye, probable osteoarthritis of the cervical and lumbar spine, and possible "RSD" of the right arm as a result of severe injuries.  *Id.*  Dr. Greenberg's only work restriction, however, was that Plaintiff would be "unable to perform work related activities that require heavy lifting or bending."  *Id.*

Case No. 1:07cv210-MP/WCS

On July 16, 2001, Robert B. David, Ph.D., performed a consultative psychological examination of Plaintiff.  R. 356-358.  Dr. David determined that no disorders of thought or mood were present, and Plaintiff's recent and remote memory were unimpaired.  R. 357.  Plaintiff reported that his sleep was disturbed by pain, his appetite was poor, and his energy level was low.  Id.  Plaintiff's test scores were in the bottom of the low average range, did not imply any significant memory deficits.  R. 358.  No diagnosis was assigned.  Id.

Plaintiff was in a motor vehicle accident on May 16, 2002, and was treated.  R. 553.  He complained of left sided neck pain.  Id.  His neck was tender to palpation.  R. 554.  "Cervical spine films show no acute fracture."  Id.  The x-ray also showed that the "disc spaces of the cervical spine are intact," and no subluxation or degenerative changes were seen.  R. 555.  Tylenol, Lortab as needed, and ice packs were prescribed.  R. 554.

Plaintiff had a cervical and lumbar MRI on May 21, 2002.  R. 573.  In the cervical spine, a small central disc protrusion was noted at C3-C4 with no forminal narrowing.  Id.  At L4-L5, the disc had degenerative signal loss with a slight disc height loss.  Id.  The disc at that level diffusely bulged, but there was no focal disc protrusion or focal nerve root compression.  Id.  At L5-S1, the disc was degenerated and decreased in height but had only a minimal diffuse bulge and was without focal disc protrusion or focal nerve root compression.  Id.

On September 20, 2002, Plaintiff returned to Oscar B. DePaz, M.D., for followup.  R. 559.  Dr. DePaz noted that by MRI on May 21, 2002, Plaintiff had a small central disc protrusion at C3-C4.  Id.  He also had lumbar spondylosis at L4-L5 and L5-S1 "without

focal nerve root compression." *Id.* Dr. DePaz found range of motion restricted in all quadrants, with persistent tenderness to palpation over the paracervical muscles. *Id.* Plaintiff also reported that he continued to experience pain in the left lateral elbow and extensor mass. *Id.*

On April 24, 2003, a radiograph of Plaintiff's right shoulder was found to be a "normal study." R. 579.

On June 3, 3003, Plaintiff fell and landed on his left hip. R. 586. He fractured his left hip (left femur intertrochanteric fracture). *Id.* and R. 598. He underwent surgery, an open reduction internal fixation of his left intertrochanteric hip fracture, using an intramedullary nail and screw device. R. 586. Plaintiff suffered some pain after the surgery that was attributed to the fracture and the surgery. *Id.*

On August 12, 2003, Dr. Greenberg prepared a "Clinical Assessment of Pain by Consulting Physician." R. 639-644. Dr. Greenberg said that Plaintiff had repeatedly reported that he experienced pain, and he said that a person with Plaintiff's diagnosis would be expected to experience pain. R. 639. He felt that Plaintiff's pain was somatogenic. *Id.* He said that Plaintiff's pain was continuous, chronic, and required nonopiod medication. R. 640-641. Dr. Greenberg said that he did not expect Plaintiff to suffer any side effects from the medication. R. 641. Dr. Greenberg said that Plaintiff was subjectively reporting to him that his pain was marked, 6 or 7 on a scale of 10, that would interfere with "concentration, persistence and pace and prevents the patient from completing tasks relating to the activities of daily living without frequent (hourly) interruptions for pain relief" during an 8 hour work day. R. 641-642. Dr. Greenberg did not, however, rate the pain that severe. He found instead that Plaintiff's pain was

moderate, 3-5 on a scale of 10, "that would not prevent the patient from performing most activities of daily living; and, that would not interfere with [his] working 8 hours a day 5 days a week . . ." with normal breaks.  R. 642.  See also R. 643.  He felt that Plaintiff was only mildly restricted, except that he had a moderate limitation due to pain.  R. 643.

Dr. Greenberg also completed a "Residual Functional Capacity Evaluation by Consulting Physician."  R. 645-648.  He expressed the opinion that Plaintiff could sit for 3-4 hours at a time for a total of 7-8 hours a day.  R. 645.  He thought that Plaintiff could stand for 1 to 2 hours at a time, and could stand for a total of 4-5 hours daily.  R. 646.  He felt that Plaintiff could sit or stand at will 6 to 7 hours a day.  *Id.*  Dr. Greenberg said he thought that Plaintiff could frequently (40 minutes each hour for an 8 hour day) lift only 1 to 5 pounds, and could occasionally (20 minutes each hour for an 8 hour day) lift the same weight.  R. 647.  Dr. Greenberg said that the clinical findings to support these opinions were that Plaintiff had a decreased range of motion of his cervical and lumbar spine, decreased strength of his right arm, right leg, and right grip, atrophy of his right forearm, and his right arm was tender to palpation.  *Id.*

There are treatment notes from Dr. DePaz from September, 2006, through March, 2007.  On September 6, 2006, Plaintiff was seen by Dr. DePaz.  R. 669.  He had had surgery with Dr. Sharkey on August 23, 2006.  *Id.*  He was using a long arm splint.  R. 670.  Lortab and a Duragesic patch were prescribed.  *Id.*  On November 17, 2006, Dr. DePaz noted that a repeat surgery with Dr. Sharkey was scheduled.  R. 666.  On February 8, 2007, Plaintiff was seen at Southeastern Rehabilitation by Dr. DePaz.  R. 655.  He said that he had increased burning, tingling, and an electrical sensation in his

right arm. *Id*. On March 12, 2007, Plaintiff underwent an EMG and NCS test, having reported persistent complaints of pain, numbness, and weakness in his right upper extremity. R. 649. The results were normal with the exception of a "mildly prolonged left median nerve motor distal latencies," but with "normal sensory response." R. 651. It was felt that the findings "may represent residual damage from prior compression." R. 652. The diagnosis was parethesias.[12] *Id*.

**Legal Analysis**

As discussed in greater detail above, Plaintiff testified that he cannot use his right upper extremity due to pain and injury. He also testified that he suffers pain in his back, legs, and hip that affects his ability to stand, walk, or sit for any significant length of time.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law,

---

[12] Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY. Formication is a tactile hallucination in which there is a sensation of tiny insects crawling over the skin. *Id.*

      that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

      "A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

      There is no dispute that Plaintiff has several significant underlying medical conditions, but Plaintiff has not argued that there is any objective medical evidence confirming the severity of his pain.  The issue is whether Plaintiff has shown that his objectively determined medical conditions can reasonably be expected to give rise to the claimed pain.

The ALJ in this case did not make specific findings to support the conclusion that Plaintiff's self-reported experience of pain was not fully credible. R. 460. However, he did thoroughly discuss the medical evidence, and that evidence supports the conclusion reached.

Perhaps the most significant evidence is dated August 12, 2003, from Dr. Greenberg. While Dr. Greenberg said that Plaintiff subjectively was reporting marked pain, 6-7 on a scale of 10, Dr. Greenberg felt, based upon these subjective reports and his objective findings that Plaintiff only suffered moderate pain, 3-5 on a scale of 10.[13] R. 641-642. Moderate was defined as not preventing the patient from performing most activities of daily living. R. 642. This, standing alone, is substantial evidence to find that Plaintiff's experience of pain is not as severe as he reports.

On the same date, Dr. Greenberg expressed the opinion that Plaintiff could sit for 3-4 hours at a time for a total of 7-8 hours a day. R. 645. He thought that Plaintiff could stand for 1 to 2 hours at a time, and could stand for a total of 4-5 hours daily. R. 646. He felt that Plaintiff could sit or stand at will 6 to 7 hours a day. *Id.* Dr. Greenberg said he thought that Plaintiff could frequently (40 minutes each hour for an 8 hour day) lift only 1 to 5 pounds, and could occasionally (20 minutes each hour for an 8 hour day) lift the same weight. R. 647. This also is evidence that despite the experience of pain, Plaintiff retains significant residual functional capacity.

---

[13] The ALJ noted these two findings, finding them to be inconsistent. R. 460. They are not. One reports what Plaintiff said and the other reports what Dr. Greenberg thought.

Further, all treating physicians have found that Plaintiff's work limitations do not preclude the ability to do light work, though without the use of his right hand and arm. On June 1, 1993. Dr. DePaz determined that Plaintiff could still perform light work, even though he found Plaintiff to have a 27% permanent impairment. R. 190-191. More relevant to the claim for disability insurance benefits, on June 9, 1999, Dr. Jain released Plaintiff to "light duty, no lifting over 10 lbs with a splint." R. 261. On September 21, 1999, Dr. Jain again released Plaintiff to light work. R. 231. Plaintiff saw Dr. Dell on October 9, 2000, thought Plaintiff to be fit for light work, but with no use of the right hand. R. 266. *Id.* On October 23, 2000, Dr. Dell thought that Plaintiff had "no use of the right hand, five pound weight lift limit." *Id.* That same work restriction was noted on December 11, 2000, no lifting greater than five pounds, no use of his right arm, and wear a splint at work. R. 264. On April 18, 2001, Dr. Greenberg's only work restriction was that Plaintiff would be "unable to perform work related activities that require heavy lifting or bending." R. 307. The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

Additionally, the results of the March 12, 2007, EMG and NCS test were normal with the exception of a "mildly prolonged left median nerve motor distal latencies," but with "normal sensory response." R. 651. It was felt that the findings "may represent residual damage from prior compression." R. 652. The diagnosis was parethesias, R. 652, which, while an abnormality, does not appear to be a painful condition.

The MRI of Plaintiff's spine on May 21, 2002, revealed only mild degenerative conditions. Plaintiff's cervical spine had a small central disc protrusion at C3-C4 but

with no forminal narrowing.  R. 573.  At L4-L5, Plaintiff's disc had degenerative signal loss with a slight disc height loss.  *Id.*  The disc at that level diffusely bulged, but there was no focal disc protrusion or focal nerve root compression.  *Id.*  At L5-S1, the disc was degenerated and decreased in height but had only a minimal diffuse bulge and was without focal disc protrusion or focal nerve root compression.  *Id.*  Dr. DePaz read the findings and noted only that Plaintiff had a small central disc protrusion at C3-C4.  R. 559.  He also noted that Plaintiff had lumbar spondylosis at L4-L5 and L5-S1 "without focal nerve root compression."  *Id.*

**Conclusion**

In summary, the ALJ determined that Plaintiff does suffer from a number of impairments and experiences pain in his daily activities, but that these impairments do not entirely preclude all work.  Important to this conclusion was the finding that Plaintiff does not experience pain to the degree described in his testimony.  That subsidiary finding is supported by substantial evidence and should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 30, 2008.


   s/    William C. Sherrill, Jr.
   **WILLIAM C. SHERRILL, JR.**
   **UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**